1  JACKLIN CHOU LEM (Cal. Bar No. 255293)
   MAY LEE HEYE (Cal. Bar No. 209366)
2  HOWARD J. PARKER (Wash. Bar No. 07233)
   KELSEY C. LINNETT (Cal. Bar No. 274547)
3  ANNA TRYON PLETCHER (Cal. Bar No. 239730)
   Antitrust Division
4  U.S. Department of Justice
   450 Golden Gate Avenue
5  Box 36046, Room 10-0101
   San Francisco, CA 94102-3478
6  Tel: (415) 436-6660; Fax: (415) 436-6687
   jacklin.lem@usdoj.gov
7
8  Attorneys for the United States

9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                     SAN FRANCISCO DIVISION
12

13

| UNITED STATES OF AMERICA | No. CR 11-0488 RS |
|---|---|
| v. | **UNITED STATES' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU** |
| EAGLE EYES TRAFFIC INDUSTRIAL CO., LTD.; E-LITE AUTOMOTIVE, INC.; HOMY HONG-MING HSU; and YU-CHU LIN, aka David Lin, | Sentencing Date: **January 22, 2013** Time: 2:30 p.m. Place: Rm. 3, 17th Floor |
| Defendants. | Hon. Richard Seeborg United States District Judge |

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    THE OFFENSE CONDUCT AND CHARGE ............................................................ 2

     A.    The Auto Lights Price-Fixing Conspiracy Was Vast and Sophisticated ........... 2

     B.    Homy Hsu Played a Central Role in the Execution of the Conspiracy ............. 4

         1.    Homy Hsu Was Eagle Eyes' Representative and Spokesperson in Conspiracy Meetings ........................................................................ 4

         2.    Homy Hsu Was the Architect of Eagle Eyes' Pricing Formulas Which He Based on the Pricing Agreement ........................................... 6

         3.    Homy Hsu Exercised Control Over Prices Eagle Eyes' U.S. Distributors Charged ........................................................................ 6

         4.    Homy Hsu Recruited Subordinates to Assist in Executing the Conspiracy ............................................................................. 7

     C.    Homy Hsu Knew His Conduct Was Illegal and Sought to Conceal It ............. 10

III.   LEGAL STANDARDS ........................................................................................... 11

IV.  SENTENCING GUIDELINES ............................................................................... 11

     A.    The Volume of Affected Commerce Is At Least $88 Million ......................... 12

     B.    Homy Hsu Was a Manager or Supervisor in the Conspiracy ......................... 16

V.   RECOMMENDED SENTENCE ............................................................................. 18

     A.    The Nature and Circumstances of the Offense and the History and Characteristics of Homy Hsu Support a Guidelines Sentence ........................ 19

     B.    The Recommended Sentence Promotes Respect for the Law, Provides Just Punishment for the Offense, and Affords Adequate Deterrence ..................... 21

     C.    The Recommended Sentence Does Not Result in Unwarranted Sentencing Disparities ............................................................................... 22

     D.    Restitution Is Not Necessary ........................................................................... 24

VI.  CONCLUSION ....................................................................................................... 25

i

## <u>**TABLE OF AUTHORITIES**</u>

**Cases**

*In re Aftermarket Automotive Lighting Products Antitrust Litigation,*
   No. 09-ML-2007 GW ...................................................................................27

*United States v. Andreas,*
   216 F.3d 645 (7th Cir. 2000) ..............................................................14, 16

*United States v. Barnes,*
   993 F.2d 680 (9th Cir. 1993) ..............................................................17, 19

*United States v. Becerril-Lopez,*
   541 F.3d 881 (9th Cir. 2008) ....................................................................25

*United States v. Berger,*
   587 F.3d 1038 (9th Cir. 2009). ..................................................................12

*United States v. Booker,*
   543 U.S. 220 (2005)...................................................................................11

*United States v. Caperna,*
   251 F.3d 827 (9th Cir. 2001) ......................................................................26

*United States v. Carter,*
   560 F.3d 1107 (9th Cir. 2009) ....................................................................22

*United States v. Edwards,*
   622 F.3d 1215 (9th Cir. 2010) ....................................................................21

*United States v. Egge,*
    223 F.3d 1128 (9th Cir. 2000) ...................................................................17

*United States v. Eureka Laboratories, Inc.,*
   103 F.3d 908 (9th Cir. 1996) ......................................................................20

*United States v. Fernandez,*
   443 F.3d 19 (9th Cir. 2009) ........................................................................25

*United States v. Fuller,*
   897 F.2d 1217 (1st Cir. 1990)....................................................................18

*United States v. Gall,*
   552 U.S. 38 (2007).....................................................................................11

*United States v. Giordano,*
   261 F.3d 1134 (11th Cir. 2001) ................................................................13

ii

*United States v. Green*,
  592 F.3d 1057 (9th Cir. 2010) .................................................................24

*United States v. Hayter Oil*,
  51 F.3d 1265 (6th Cir. 1995) ...........................................................14, 15

*United States v. Helmy*,
  951 F.2d 988 (9th Cir. 1991) .................................................................17

*United States v. Koenig*,
  952 F.2d 267 (9th Cir. 1991) .................................................................18

*United States v. Marcial-Santiago*,
  447 F.3d 715 (9th Cir. 2006) .................................................................25

*United States v. Mares-Molina*,
  913 F.2d 770 (9th Cir. 1990) .................................................................18

*United States v. Martin*,
  455 F.3d 1227 (11th Cir. 2006) .............................................................23

*United States v. Sauteurn*,
  504 F.3d 1175 (9th Cir. 2007) ...............................................................24

*United States v. SKW Metals & Alloys, Inc.*,
  195 F.3d 83 (2nd Cir. 1999).......................................................13, 15, 16

*United States v. Treadwill*,
  593 F.3d 990 (9th Cir. 2010) .................................................................25

*United States v. VandeBrake*,
  771 F. Supp. 2d 961(N.D. Iowa 2011).....................................................21

**Statutes**

15 U.S.C. §§ 15 *et seq*..................................................................................27
18 U.S.C. § 3553(a) ...............................................................................11, 26
18 U.S.C. § 3553(a)(1)..................................................................................20
18 U.S.C. § 3553(a)(2)(A)-(B) ......................................................................22
18 U.S.C. § 3553(a)(4)...........................................................................11, 19
18 U.S.C. § 3553(a)(6)...........................................................................24, 25
Antitrust Criminal Penalty Enhancement and Reform
  Act of 2004, Pub. L. 108-237 (2004)..........................................................20

**Sentencing Guidelines**

U.S.S.G. §2R1.1.............................................................................................12
U.S.S.G. §2R1.1(a).........................................................................................12

iii

U.S.S.G. §2R1.1(b)(2) ...........................................................................14, 15, 20

U.S.S.G. §2R1.1(b)(2)(B) ...............................................................................15

U.S.S.G. §2R1.1(b)(2)(C) ...............................................................................12

U.S.S.G. §2R1.1(c)(1) .....................................................................................13

U.S.S.G. §3B1.1 ...............................................................................................12

U.S.S.G. §3B1.1(b) ..........................................................................................12

U.S.S.G. §3E1.1(b) ..........................................................................................12

U.S.S.G. §3E1.1(a) and (b) .............................................................................12

U.S.S.G. §5H1.11 .............................................................................................22

## Other Authorities

150 Cong. Rec. H3657 (daily ed. June 2, 2004) (statement of Rep. Sensenbrenner)..............20

Donald I. Baker, *The Use of Criminal Law Remedies to Deter and Punish Cartels and Bid
   Rigging*, 69 Geo. Wash. L. Rev. 693, 705 (2001)..................................................23

Richard A. Posner, *An Economic Theory of Criminal Law*,
   85 Colum. L. Rev. 1193, 1215 (1985) ............................................................23

S. Rep. No. 98-225, at 76 (1983) *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3259 .................22

S. Rep. No. 98-225, at 91-92 (1983) *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75.......23

Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*,
   47 Wm. & Mary L. Rev. 721, 724 (2005) ..........................................................23

iv

# I.      INTRODUCTION

The United States recommends that the Court sentence Homy Hsu to serve 27 months in prison.  Homy Hsu participated for seven years in a conspiracy to fix the price of aftermarket auto lights.  By any measure—duration (almost a decade); number of products covered (thousands); dollar value of sales affected (hundreds of millions); number of companies involved (seven); number of people involved (more than a dozen); number of hours spent conducting conspiracy meetings (countless); number of documents created and exchanged to coordinate and execute the agreement (hundreds)—the aftermarket auto lights price-fixing conspiracy was vast and sophisticated.  Its primary target was American consumers in the United States.

Although it was set in motion by the highest-ranking chairmen of the three major aftermarket auto lights manufacturers in Taiwan, the conspiracy persisted for seven years because people such as the defendant Homy Hsu played critical roles in its execution and continuing success.  As Vice Chairman of Eagle Eyes Traffic Industrial Co., Ltd., Homy Hsu was the second-highest-ranking officer of the company.  He had the most intimate knowledge of how Eagle Eyes calculated its prices; he developed detailed pricing formulas in accordance with the agreement; he enlisted, recruited, and directed subordinate employees to assist in executing the conspiracy; he instructed them to keep the conspiracy secret and confidential; he represented Eagle Eyes in repeated conspiracy meetings during which he advanced proposals and made decisions on behalf of Eagle Eyes; and he affirmed, over and over again, Eagle Eyes' commitment to the price-fixing agreement.  For seven years, Homy Hsu was in a position to stop Eagle Eyes' participation in the conspiracy, but he did not do so.

A prison sentence of 27 months, which represents the bottom of the Guidelines range, is supported by the statutory sentencing goals.  It reflects the seriousness of the violation and the defendant's critical role in the offense, provides just punishment, and affords adequate deterrence.  Moreover, it does not create unwarranted sentencing disparities with other co-conspirators who have been or will be sentenced.  Unlike those co-conspirators, Homy Hsu has never agreed to cooperate with the government, has never provided any assistance, and has not pledged any future cooperation as part of his plea agreement.  That others may have received

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

reduced sentences because they cooperated with the government is immaterial to the sentence that is appropriate for Homy Hsu.

## II.   THE OFFENSE CONDUCT AND CHARGE

Homy Hsu was arrested at Los Angeles International Airport (LAX) on July 12, 2011 while passing in transit on his way to Mexico and Central America.  Declaration of Jacklin Chou Lem in Support of US' Sentencing Memo ("Lem Declaration"), Exs. A, B.  Before his arrest, Hsu had rejected a plea offer from the government and, through his former counsel, had indicated that he was considering staying in Taiwan, out of reach of prosecution by the United States.  Lem Decl. ¶ 3.  Hsu's former counsel stated that the United States would not be able to extradite Hsu from Taiwan and that Hsu understood that if he were indicted, he would be unable to travel outside Taiwan.  *Id.*  Hsu's former counsel further stated that Hsu was close to retirement age, had no ties to the United States, and was financially able to stay in Taiwan where he lived with his wife and family.  *Id.*  When Hsu was arrested at LAX, he repeatedly stated that he could not be arrested because he was only transiting the United States and never entered the country.  Lem Decl., Ex. A.

One week after his arrest, on July 19, 2011, a grand jury indicted Hsu for his seven-year participation in a conspiracy to fix the price of aftermarket auto lights in violation of 15 U.S.C. § 1.  Dkt. No. 5.  Hsu was released from detention on a $1,000,000 secured bond on August 18, 2011.  Dkt. No. 17, 18.  Later, on November 29, 2011, Hsu was charged in a superseding indictment along with his boss Chairman Yu-Chu Lin, his employer Eagle Eyes, and Eagle Eyes' wholly owned subsidiary E-Lite Automotive, Inc.  Dkt. No. 30.  Trial was set to begin on October 29, 2012, but the parties reached a plea agreement in late September 2012.  The Court accepted Hsu's guilty plea on September 25, 2012.  Dkt. No. 243.  Hsu is scheduled to be sentenced on January 22, 2013.

### A.   The Auto Lights Price-Fixing Conspiracy Was Vast and Sophisticated

The aftermarket auto lights conspiracy involved seven companies and over a dozen current and former employees of those companies.  The companies involved were three Taiwan-based manufacturers (TYC Brother Industrial Co., Ltd., Depo Auto Parts Industrial Co., Ltd.,

2

and Eagle Eyes Traffic Industrial Co., Ltd.) and four United States distributors (Genera Corporation, Maxzone Vehicle Lighting Corp., Sabry Lee (U.S.A.), Inc., and E-Lite Automotive, Inc.).[1]  Five top-level executives have been charged in connection with the conspiracy,[2] and dozens of lower-level employees, including sales account executives and personnel, also participated in its execution.  S*ee, e.g.*, Lem Decl., Exs. LL, MM.

The conspiracy was hatched in 2001.  That year, Chairman Yu-Chu Lin of Eagle Eyes, Chairman C.C. Wu of TYC, and Chairman Shiu-Min Hsu of Depo met four times at a hotel in Taiwan and founded the conspiracy.  Lem Decl., Exs. C-F, PP at 1-3.  At the first meeting, the chairmen agreed that they would maintain a fixed spread between each company's prices.  At the next three meetings, the chairmen confirmed the fundamental agreement and negotiated additional details.  Signed meeting minutes memorialize the agreement to fix the prices of aftermarket auto lights.  Lem Decl., Exs. C-F.  The fourth and final meeting minutes state, "The three-party set price shall be signed jointly by the 3-parties' chairmen to ensure the price agreement."  Lem Decl., Exs. F, OO at 8, KK at 8-9, PP at 3.

The conspiracy persisted for seven years, until September 2008.  During those seven years, the co-conspirators participated in repeated meetings, which are well-documented in meeting minutes and agendas.  Lem Decl., Exs. G-U.  These meetings took place in person and via telephone in the United States and Taiwan.  Lem Decl., Ex. KK at 25.  At some meetings, the

---

[1] Genera is a partially owned affiliate and exclusive U.S. distributor for TYC.  Maxzone is a wholly owned subsidiary and exclusive U.S. distributor for Depo.  Sabry Lee was a major distributor for Eagle Eyes from about September 2003 through the end of 2005, during which time Sabry Lee and Eagle Eyes had a profit-sharing arrangement.  Subsequently, beginning in 2006, Eagle Eyes also began distributing auto lights through its wholly owned subsidiary E-Lite.

[2] Polo Shu-Sheng Hsu was charged by Information, has pled guilty, and has served his sentence.  CR 11-0061 RS.  Chien Chung Chen, a/k/a/ Andrew Chen, was charged by Information, has pled guilty, and awaits sentencing, currently set for February 5, 2013.  CR 11-0166 RS.  Shiu-Min Hsu was charged by Information, has pled guilty, and awaits sentencing, currently set for February 19, 2013.  CR 12-0121 RS.  All three defendants provided substantial assistance to the government in its investigation and prosecution of this matter, and all three received or are likely to receive reduced sentences as a result.  A fourth defendant, Chairman Yu-Chu Lin, has not appeared in the United States to face the charges, and he remains abroad as an international fugitive.

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

conspirators discussed adjusting prices to accommodate changing market conditions.  *See*, *e.g.*, Lem Decl., Exs. I, M, T.  At other meetings, they coordinated price announcements and addressed compliance and enforcement issues.  *See, e.g.*, Lem Decl., Exs. H, I, T.  Twice, in 2005 and 2008, they undertook a major reorganization and adjustment of their prices.  Lem Decl., Exs. QQ at 10, LL at 6, 9.  Each time, the conspirators held several meetings to negotiate, reach consensus, and implement the new prices.  Lem Decl., Exs. M, P-U, QQ at 11.  To protect the conspiracy from other competition and to deter new entry, the conspiring companies also agreed in meetings to selectively lower prices of certain products that smaller, newer companies also manufactured.  Lem Decl., Exs. QQ at 12-13, LL at 5-6.

The conspiracy was sophisticated and required a high level of coordination.  The conspiracy's activities were coordinated through the exchange of documents such as meeting agendas and minutes, *see*, *e.g.*, Lem Decl., Exs. C-U; voluminous price lists documenting the price each company would charge for thousands of specific models of auto lights, *see*, *e.g.*, Lem Decl., Ex. V; and complex pricing formulas and charts documenting the method for calculating each company's prices and how adjustments would be made for factors such as volume discounts and certification by a third-party testing and standards organization, *see*, *e.g.*, Lem Decl., Exs. Y, BBB.  These documents were exchanged in person at conspiracy meetings as well as via email and fax.  Lem Decl., Exs. LL at 4, MM at 4.

**B.    Homy Hsu Played a Central Role in the Execution of the Conspiracy**

Homy Hsu was the Vice Chairman of Eagle Eyes during the period for which he is charged with participation in the conspiracy, November 2001 through September 2008.  He was the company's second-highest-ranking officer, reporting directly to Chairman Yu-Chu Lin.  Lem Decl., Ex. EE.  Homy Hsu played a critical, continuous role in the price-fixing conspiracy for over seven years, from the beginning of Eagle Eyes' participation in 2001 to the end in 2008.

**1.    Homy Hsu Was Eagle Eyes' Representative and Spokesperson in Conspiracy Meetings**

Homy Hsu understood the goals of the conspiracy from the beginning, having participated in at least one, if not more, of the 2001 chairmen-level meetings during which the

4

1   conspiracy was formed.  Lem Decl., Exs. JJ at 1, 2, OO at 7, 8.  Homy Hsu continued to

2   participate in meetings between 2002 and 2008, and multiple witnesses have described Homy

3   Hsu as Eagle Eyes' main representative in conspiracy meetings during that period.  Lem Decl.,

4   Exs. KK at 28, NN at 2, QQ at 7, 11.  Multiple witnesses have also said that Homy Hsu had the

5   authority in conspiracy meetings to make proposals and decisions on behalf of Eagle Eyes.  Lem

6   Decl., Exs. NN at 2, QQ at 7.

7          The audio recording of a June 6, 2008 major conspiracy teleconference showcases Homy

8   Hsu's central role as the key representative, spokesperson, and decision-maker for Eagle Eyes.

9   Lem Decl., Exs. Z-CC.  The June 6, 2008 teleconference was attended by at least eight co-

10  conspirators.  Lem Decl., Ex. Z at 2-3.  But the audio recording demonstrates that there were

11  three leaders at the meeting, one for each of the three manufacturers: Homy Hsu on behalf of

12  Eagle Eyes, Drue Hsia on behalf of TYC, and Chairman Shiu-Min Hsu on behalf of Depo.  It is

13  Homy Hsu who engages Drue Hsia and Chairman Hsu in a discussion regarding a major price

14  reorganization.  Lem Decl., Exs. Z-CC, passim.  On the recorded telephone conference, it is

15  Homy Hsu to whom Drue Hsia and Chairman Hsu direct complaints of price deviation.  Lem

16  Decl., Ex. CC at 20-28.  It is Homy Hsu who reaffirms Eagle Eyes' commitment to the

17  agreement, declaring, "[W]e will follow our agreement."  *Id.* at 22.  It is Homy Hsu who agrees

18  that Eagle Eyes would follow the price mechanism proposed.  *Id.* at 68 (Hsu states, "Yes, Yes.  It

19  is okay to do pricing by this mechanism . . . just follow the mechanism of 6-9% to set price.  This

20  is okay.  No problem.").  It is Homy Hsu who agrees that Eagle Eyes would adopt an elaborate

21  cover story to explain to customers why prices were changing so dramatically.  *Id.* at 14-16, 66

22  (in reference to Drue Hsia's proposal that the co-conspirators "make up a story" to explain the

23  price adjustments to customers, Hsu states, "Well, this is good . . . No problem.").

24         Documents also confirm Homy Hsu's active participation as Eagle Eyes' representative

25  at conspiracy meetings.  For example, in a meeting on February 2, 2008, Homy Hsu was the sole

26  representative from Eagle Eyes.  Minutes from that meeting document that one item on "EE's

27  [Eagle Eyes'] agenda" was a proposal to "reorganize the three companies' price every half a

28  year" due to differences in the timing of the companies' new product development.  Lem Decl.,

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

Ex. P.  Homy Hsu's proposal to reorganize the prices was reiterated in a meeting on March 19, 2008.  Lem Decl., Ex. R ("EE [Eagle Eyes] suggest the three companies to re-update the price").  Hsu's participation is also evidenced by his own handwritten notes taken during the meetings.  *Compare* Lem Decl., Exs. L (handwritten notes on meeting agenda), S (same), U (same), *with* Ex. II (known handwriting exemplar taken from Hsu).

### 2. Homy Hsu Was the Architect of Eagle Eyes' Pricing Formulas Which He Based on the Pricing Agreement

As a Vice Chairman with pricing authority, Homy Hsu was the architect of formulas Eagle Eyes used to quote prices to its customers.  These formulas were based on the price agreement.  Lem Decl., Ex. JJ at 2, 5.  In approximately 2002, Homy Hsu drafted an internal pricing document titled "New Price Rules."  Lem Decl., Exs. JJ at 5, FF.  Homy Hsu drafted the price rules based on prices discussed in the conspirator meetings.  *Id.*  The formulas specifically referenced prices charged by Eagle Eyes' competitors TYC and Depo.  *Id.*  In 2003, Eagle Eyes revised its internal pricing formulas.  Lem Decl., Ex. GG.  Vincent Chou, a former Eagle Eyes employee who circulated the revised 2003 price formulas to Eagle Eyes employees, has said that the formulas were based on the pricing agreement among the conspiring companies.  Lem Decl., Ex. TT at 2.  Chou has also stated that Homy Hsu led a discussion of the new formulas and directed Eagle Eyes staff to price according to the formulas.  *Id.* Andrew Chen, a former employee of Sabry Lee, which distributed Eagle Eyes auto lights in the United States, has also stated that Eagle Eyes' 2003 pricing formulas were based on the pricing agreement among the conspiring companies.  Lem Decl., Ex. SS at 8-9.

### 3. Homy Hsu Exercised Control Over Prices Eagle Eyes' U.S. Distributors Charged

Homy Hsu also took active steps to ensure that Eagle Eyes' U.S. distributors, Sabry Lee and E-Lite, priced in accordance with the agreement.  On multiple occasions, he advised Johnson Tsai and Andrew Chen of Sabry Lee about the existence of the pricing agreement and pressured Sabry Lee to raise its prices to be in line with the agreement.  Lem Decl., Exs. RR at 5-6, SS at 7.  Johnson Tsai, the President of Sabry Lee, stated that he received a letter from Homy Hsu

between October 2002 and September 2003 in which Homy Hsu threatened Sabry Lee if they did not cooperate with Eagle Eyes.  Lem Decl., Ex. RR at 7-8.  In the letter, Homy Hsu wrote:

> *SABRY LEE* is a new company, its relationship with *EAGLE EYES* is fish helping water, and water helping fish.  *EAGLE EYES* will absolutely 100% fully support *SABRY LEE*.  But the precondition is, that, to play the game, the rules of the game of what we have discussed with the competitors must be observed.  With the price gap permitted by everyone, using quality and service to vie for customers, everyone can jointly allocate the market to jointly obtain the profits in the market.

Lem Decl., Ex. HH at ¶ 4.

Andrew Chen, who has pled guilty to participating in the price-fixing conspiracy, was the Executive Vice President of Sabry Lee.  Andrew Chen has stated that Homy Hsu told him if he wanted to keep his job at Sabry Lee, he would have to charge prices that were in line with the pricing agreement.  Lem Decl., Ex. SS at 7.  Chen has stated further that Homy Hsu was a "control freak" who wanted Chen "under his rein."  *Id.* at 13.  Although Chen wanted to exercise some pricing independence, Eagle Eyes, including Homy Hsu, pressured him to increase Sabry Lee's prices in accordance with the price-fixing agreement.  Eventually, Chen understood that he had no choice in pricing because if he stood in the way of the price-fixing agreement, he would be fired.  Lem Decl., Ex. AAA at 2-3.

### 4. Homy Hsu Recruited Subordinates to Assist in Executing the Conspiracy

Homy Hsu also enlisted subordinates at Eagle Eyes to assist in implementing the conspiracy, including Vincent Chou, Elaine Lin, Mandy Kuo, and Ching-Tsung Lai.  The discussion below elaborates on how Homy Hsu enlisted these subordinates.

#### *Vincent Chou*

Vincent Chou was President of Eagle Eyes for an eight-month period between August 2003 and April 2004.  Lem Decl., Ex. XX at 1.  Chou had responsibility for sales and reported to Homy Hsu and Chairman Yu-Chu Lin.  Lem Decl., Exs. WW at 2, EE (Eagle Eyes organizational chart showing "President Wen-Shen Chou" (Vincent Chou) to be subordinate to Hsu and Lin).  Chou became aware of the price-fixing conspiracy when he attended a conspiracy meeting with Homy Hsu and other co-conspirators from TYC and Depo.  Lem Decl., Ex. XX at

7

2.  Chou has explained that during the time he worked at Eagle Eyes, the pricing agreement was in effect and an internal pricing document based on the price agreement was circulated within Eagle Eyes.  Lem Decl., Exs. WW at 3, XX at 3-5.

Chou has stated repeatedly that Homy Hsu and Chairman Lin made decisions on pricing, including the decision to price based on the illegal price-fixing agreement.  Moreover, Chou has stated that Hsu and Lin directed Eagle Eyes personnel, including himself, to follow those pricing decisions.  Lem Decl., Exs. WW at 2 ("Lin and Homy made the decisions on pricing" and "[e]ither Lin or Homy or both could tell Chou to implement the pricing"), XX at 3 ("only Homy Hsu or Chairman Lin would have had the authority to draft" pricing documents), TT at 2 (regarding the internal Eagle Eyes pricing document based on the price agreement, "Homy Hsu was the one to explain to the [Eagle Eyes] staff how to price" and he "asked everyone to follow [the pricing] formula[s]" in the document), TT at 3 ("Chairman Lin and Homy Hsu set the rules" and made "company policy" regarding pricing).

*Elaine Lin*

Elaine Lin worked in the sales department under Homy Hsu, managing customer accounts.  Lem Decl., Exs. ZZ (Eagle Eyes subpoena narrative response indicating that Elaine Lin's title was "Sales" and her duties included "sales"), XX at 3.  As an employee in the sales department, she was in a direct reporting line to Homy Hsu.  Lem Decl., Exs. YY (Eagle Eyes subpoena narrative response, indicating that Homy Hsu's "Immediate subordinates" were employees in the "Sales Department"), TT at 1-2 ("they all [including Elaine Lin] reported to Homy Hsu").

Homy Hsu enlisted Elaine Lin as a participant in the price-fixing conspiracy.  At Homy Hsu's request, Elaine Lin was a point of contact for TYC's Orian Chang, handling the flow of conspiracy-related communications and paperwork between TYC and Eagle Eyes.  Lem Decl., Ex. MM at 8 ("Chang e-mailed . . . Lin per Homy Hsu's requests" and "Lin . . . assisted Homy in dealing with e-mails he received" from Chang).  Internally within Eagle Eyes, Homy Hsu enlisted Elaine Lin's assistance in implementing the price agreement and kept her informed about conspiracy-related activities.  *See*, *e.g.*, Lem Decl., Ex. V (email from Homy Hsu to Elaine

8

Lin forwarding conspiracy pricing spreadsheet, which Homy Hsu described as the "Most updated three-company agreement").

### *Mandy Kuo*

Mandy Kuo was an assistant to Homy Hsu, her immediate supervisor.  Lem Decl., Exs. ZZ, XX at 3.  As with Elaine Lin, Homy Hsu enlisted Mandy Kuo's assistance in carrying out the price-fixing conspiracy.  Hsu directed Kuo to be a point of contact for TYC's Orian Chang regarding conspiracy-related communications.  Lem Decl., Exs. JJ at 12 ("Homy Hsu authorized Kuo to contact TYC with any issues, which she did on a few occasions."), MM at 8 ("Chang e-mailed Kuo . . . per Homy Hsu's requests," and "Kuo assisted Homy in dealing with e-mails he received" from Chang).  Hsu also kept Kuo informed of conspiracy-related activities by forwarding her various documents such as price lists.  *See*, *e.g.*, Lem Decl., Exs. W, V (email from Homy Hsu to Mandy Kuo, forwarding conspiracy pricing spreadsheet, which Homy Hsu described as the "Most updated three-company agreement").  After Kuo received price lists from Homy Hsu, she would calculate wholesale prices, which were then used by the sales force.  Lem Decl., Ex. JJ at 12.

### *Ching-Tsung Lai*

Ching-Tsung Lai was a Vice President of Eagle Eyes in charge of R&D and Management Production.  Lem Decl., Exs. YY, EE.  Homy Hsu was his immediate supervisor.  Lem Decl., Ex. YY.  At Homy Hsu's direction, Lai participated in a major conspiracy meeting in June 2008.  Lem Decl., Ex. CC.  Prior to the meeting, Homy Hsu emailed Lai the meeting agenda, instructed Lai to review it, solicited Lai's comments and thoughts about the agenda, and invited Lai to contact him if Lai had any questions.  Lem Decl., Ex. X.

During the conspiracy meeting, Homy Hsu introduced Lai to the other co-conspirators and prompted Lai to offer his opinions.  Lem Decl., Ex. CC at 51-53.  Thus prompted, Lai affirmed the conspiracy's goals and reassured the conspirators of Eagle Eyes' commitment to the conspiracy.  Lai stated:

> I really appreciate the comprehensive and trustworthy information
> President [Drue] Hsia [of Genera] has provided.  Here I would
> commend President Hsia's devotion on the information collection.
> . . . As for this strategy [to collectively lower prices to deter new

9

competition and protect the conspiracy], I agree very much with President Hsia's analogy by using the bag as the trap. . . . So here I want to say that since you are all sincere, we Eagle Eyes will also be sincere enough to work with each of you, so that the overall market order can be uniform in the future.

*Id.* at 52-53.

### C.    Homy Hsu Knew His Conduct Was Illegal and Sought to Conceal It

Homy Hsu knew his participation in the price-fixing conspiracy was illegal, violated antitrust laws, and ran counter to accepted business practices based on competition and free markets. But rather than withdraw from the conspiracy or refuse to participate, he persisted in his conduct for seven years, and he even took steps to conceal his conduct.

For example, during the second of two telephone conferences held in June 2008, co-conspirator Drue Hsia warned that the participants "should keep this antitrust law in mind." Hsia stated, "[N]o matter who comes in to divide and conquer, never ever, ever agree that we had two teleconferences. So these two teleconferences never existed." Lem Decl., Ex. DD at 4; *see also* Lem Decl., Ex. Z at 3 (Drue Hsia states in the first teleconference, "[F]irst of all I need to stress that the overall environment is getting more and more dangerous . . . Therefore, I have to declare first that after this meeting is adjourned, on behalf of all the, the, the attendees, we won't acknowledge such meeting was ever held."). Homy Hsu heeded Hsia's warning and took steps to preserve the secrecy of the meeting. When he forwarded conspiracy-related meeting agendas and pricing documents to his subordinates at Eagle Eyes, he admonished them that the documents were "highly classified" and "highly confidential." Lem Decl., Exs. X, Y.

On another occasion, Homy Hsu attended a conspiracy meeting with one of his subordinates, Eagle Eyes President Vincent Chou. Lem Decl., Ex. XX at 2. At this meeting, which was the first and only conspiracy meeting Vincent Chou attended, Chou challenged the conspirators, questioning why Eagle Eyes should price according to the formulas that the meeting attendees were discussing. *Id.* Chou had a common-sense notion that Eagle Eyes should have the discretion to set its own prices according to the dictates of the free market. *Id.* But Chou's challenge was spurned, and he was asked to hold his tongue. *Id.* No one else questioned the propriety of the meeting—certainly not Homy Hsu. Lem Decl., Ex. TT at 1.

10

1

## III.  LEGAL STANDARDS

2

Although the Sentencing Guidelines are now advisory, a court nevertheless must consider

3

the Guidelines sentencing range along with the other sentencing factors set forth in 18 U.S.C.

4

§ 3553(a).  *United States v. Booker*, 543 U.S. 220, 259-60 (2005).  Even after *Booker*, a district

5

court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

6

range.  *United States v. Gall*, 552 U.S. 38, 49-50 (2007).  Indeed, the Guidelines range is itself a

7

section 3553(a) sentencing factor.  *See* 18 U.S.C. § 3553(a)(4) and (5).

8

Along with the Guidelines, the other factors set forth in section 3553(a) must be

9

considered.  Section 3553(a) directs the court to impose a sentence "sufficient, but not greater

10

than necessary" to comply with the purposes set forth in sub-paragraph two.  That sub-paragraph

11

two identifies the need for the sentence imposed to:

12

> (A)  reflect the seriousness of the offense, to promote respect for the law, and

13

> to provide just punishment for the offense;

14

> (B)  to afford adequate deterrence to criminal conduct;

15

> (C)  to protect the public from further crimes of the defendant; and

16

> (D)  to provide the defendant with needed educational or vocational training,

17

> medical care, or other correctional treatment in the most effective

18

> manner.

19

In addition to the Sentencing Guidelines and the statutory purposes noted above, section 3553(a)

20

further directs to court to consider: the nature and circumstances of the offense and the history

21

and characteristics of the defendant; the need to avoid unwarranted sentencing disparities; and

22

the need to provide restitution to any victims of the offense.

23

A district court "typically uses a preponderance of the evidence standard when finding

24

facts pertinent to sentencing."  *United States v. Berger*, 587 F.3d 1038, 1047 (9th Cir. 2009).

25

## IV.  SENTENCING GUIDELINES

26

The Probation Office has calculated the Guidelines imprisonment range for Homy Hsu as

27

27 to 33 months. The government agrees that this is the appropriate imprisonment range.  The

28

range is based on a volume of affected commerce of at least $88 million, a three-point upward

11

adjustment for the defendant's manager or supervisor role in the conspiracy, and a three-point

downward adjustment for acceptance of responsibility.  The Guidelines imprisonment range is

calculated as follows:

| | |
|---|---|
| Base Offense Level (§2R1.1(a)) | 12 |
| Specific Offense Characteristics (§2R1.1(b)(2)(C)) | +6 |
| Victim Related Adjustments | 0 |
| Role in the Offense (§3B1.1(b)) | +3 |
| Obstruction of Justice | 0 |
| Chapter 4 Enhancements | 0 |
| Acceptance of Responsibility (§3E1.1(a) and (b)) [3] | -3 |
| Total Offense Level | 18 |
| Criminal History Category | I |
| Imprisonment Guidelines Range | 27- 33 months |

Under the special instruction given in U.S.S.G. §2R1.1(c)(1), the Guidelines fine range

for Homy Hsu is "one to five percent of the volume of commerce, but not less than $20,000."

Given a volume of commerce of $88 million, the Probation Office has calculated the Guidelines

fine range as between $880,000 (one percent of $88 million) and $4.4 million (five percent of

$88 million).  The government agrees that this is the appropriate Guidelines fine range.

**A.    The Volume of Affected Commerce Is At Least $88 Million**

U.S.S.G. §2R1.1 is the sentencing guideline applicable to antitrust violations.  Starting

with a base of 12, the offense level is adjusted upward depending on the "volume of commerce

attributable to the defendant."  U.S.S.G. §2R1.1(b)(2).  The volume of commerce attributable to

---

[3] Under U.S.S.G §3E1.1(b), the government moves for a one-level decrease in the offense level because Homy Hsu "assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."  With this one-level decrease, combined with a two-level decrease under U.S.S.G. §3E1.1(a) for clear acceptance of responsibility, the Probation Office has determined that the offense level should be reduced by a total of three levels.  The government agrees with this determination.

12

1   "an individual participant in a[n antitrust] conspiracy is the volume of commerce done by him or

2   his principal in goods or services that were *affected* by the violation." *Id.* (emphasis added).

3        Determining the volume of affected commerce "does not require a sale-by-sale

4   accounting, or an econometric analysis, or expert testimony." *United States v. SKW Metals &*

5   *Alloys, Inc.*, 195 F.3d 83, 91 (2nd Cir. 1999).  Rather, courts have uniformly held that all sales

6   made by the defendant during the conspiracy period should be presumed affected.  *United States*

7   *v. Giordano*, 261 F.3d 1134, 1146 (11th Cir. 2001) (presuming all sales within conspiracy period

8   were affected unless the conspiracy was wholly a "non-starter" or "ineffectual"); *see also United*

9   *States v. Andreas*, 216 F.3d 645, 678 (7th Cir. 2000) (holding that "the presumption must be that

10  all sales during the period of the conspiracy have been affected by the illegal agreement, since

11  few if any factors in the world of economics can be held in strict isolation"); *United States v.*

12  *Hayter Oil*, 51 F.3d 1265, 1273 (6th Cir. 1995) (concluding that "the volume of commerce

13  attributable to a particular defendant . . . includes all sales of the specific types of goods or

14  services which were made by the defendant or his principal during the period of the

15  conspiracy").

16       The presumption that all sales made during the conspiracy are affected by the conspiracy

17  is supported by the purpose of the Sherman Act and the *per se* rule against price fixing.  As the

18  Sixth Circuit reasoned, "[i]t would be an anomaly to declare price fixing illegal per se without

19  regard to its success, merely because of its plainly anticompetitive effect, but to provide for a

20  fine only if the price fixing were successful." *Hayter Oil*, 51 F.3d at 1274.  Such a rule would

21  relieve the government of its burden to ascertain a conspiracy's success "for purposes of

22  obtaining a conviction only to have to bear that very burden to establish the propriety of any

23  fine." *Id.*  Requiring this "burdensome inquiry" into the volume of commerce for sentencing

24  purposes would be inconsistent with the *per se* rule itself. *Giordano*, 261 F.3d at 1146 (quoting

25  *Hayter Oil*, 51 F.3d at 1273).  "[T]he Sentencing Commission intended that the government have

26  the benefit of a per se rule both at trial and at sentencing to avoid the protracted inquiry into the

27  day-to-day success of the conspiracy." *Hayter Oil*, 51 F.3d at 1274; *see also* U.S.S.G. §2R1.1,

28  Commentary Background at ¶ 4.

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

1    The government has shown by a preponderance of the evidence that the volume of

2  affected commerce is at least $88 million.  Lem Decl., Ex. UU (declaration of Christopher Ries).

3  As described in the Ries declaration, the government reviewed sales data files Eagle Eyes

4  produced to the United States.  *Id.* ¶ 4.  The data files contain thousands of records of individual

5  product sales made and invoiced by Eagle Eyes to customers in the United States during the

6  years 1999-2010.  *Id.*  Using this data and applying adjustments for the exchange rate and returns

7  and rebates, the government estimated the total volume of affected commerce for Eagle Eyes

8  between the years 2001 and 2008 to be at least $88 million.  *Id.* ¶¶ 5, 8.  With a volume of

9  affected commerce that exceeds $40 million, but is less than $100 million, the offense level for

10  the defendant is adjusted upward by six points.  U.S.S.G. §2R1.1(b)(2)(C).

11    The defendant has not disputed that Eagle Eyes made at least $88 million worth of sales

12  during the 2001-2008 conspiracy he has admitted to joining.  The government anticipates that the

13  defendant will argue to the Court, as he has argued to the Probation Office, that six years worth

14  of sales accounting for over $50 million dollars should be excluded.  With these sales excluded,

15  the defendant asserts that the volume of affected commerce is approximately $37 million,

16  warranting a four - rather than a six - point increase in the offense level.  U.S.S.G.

17  §2R1.1(b)(2)(B) (offense level is adjusted by four points for volume of commerce that is greater

18  than $10 million but less than $40 million).

19    The defendant's primary argument for excluding these sales is that they were not

20  "compliant" with the agreed-upon prices.  But the defendant fundamentally misunderstands the

21  relevant legal standard.  The applicable standard is whether a sale is "affected" by the

22  conspiracy, not whether it is "compliant" with the agreed-upon prices.  The term "affected" is

23  "very broad and would include all commerce that was influenced, directly or indirectly, by the

24  price-fixing conspiracy."  *Hayter Oil*, 51 F.3d at 1273.  "Sales can be 'affected' when the

25  conspiracy merely acts upon or influences negotiations, sales prices, the volume of goods sold,

26  or other transactional terms."  *SKW*, 195 F.3d at 90.  And "[w]hile a price-fixing conspiracy is

27  operating and has any influence on sales, it is reasonable to conclude that all sales made by

28  //

14

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

defendants during that period are 'affected' by the conspiracy," *id.* at 90, "without regard to whether individual sales were made at the target price," *Hayter Oil*, 51 F.3d at 1273.

Simply put, a price-fixing conspiracy need not operate perfectly to affect sales, and it is error for a sentencing court to count only those sales made at or above the agreed-upon prices. *See*, *e.g.*, *SKW*, 195 F.3d at 93. Moreover, non-compliance does not mean that a conspiracy was a non-starter or ineffectual. *Giordano*, 261 F.3d at 1147, n.17 (the fact that a conspirator did not completely abide by the illegal agreement does not mean that the conspiracy was a non-starter; the situation "simply reflects classic 'cheating' on a price-fixing agreement").

A sale may be excluded from the volume of commerce if it is "completely unaffected" by the conspiracy. The defendant bears the burden of proving the "rare" or "odd" case of a sale that is "completely unaffected." *Andreas*, 216 F.3d at 678-679. For example, "a defendant's brother-in-law might call one day and ask for a product at a bargain price in order to make a quick and urgently needed resale" and the seller might then "agree[] to the bargain price motivated solely by concern to help his relative, with no thought whatever about the fixed price against which he quotes to all other customers." *SKW* (Newman, J. concurring), 195 F.3d at 93. Such a rare circumstance involving "extreme facts" may satisfy a defendant's burden to show a "demonstrably uninfluenced" sale that should be excluded from the volume of commerce. *Id.*

Here, however, the defendant has not met his burden to show a single sale that was "completely unaffected" during the conspiracy period. To the contrary, the evidence shows that the conspiracy did affect the prices Eagle Eyes charged. For example, as a result of attending conspiracy meetings, Eagle Eyes gained better market intelligence than they otherwise would have, and the price information TYC provided in conspiracy meetings was taken into account in Eagle Eyes' pricing formulas. Lem Decl., Ex. JJ at 4. Moreover, Homy Hsu, who was responsible for setting prices, developed an internal pricing document in which he calculated Eagle Eyes' prices based on TYC's and Depo's price, prices Homy Hsu obtained directly from TYC and Depo pursuant to the agreement. *Id.* at 4-5.

Were it the case that Eagle Eyes simply factored the prices of its competitors into its own price determination, the defendant would be correct in arguing, as he has to the Probation Office,

15

that such conduct does not constitute price fixing and is not unlawful.  But here, that is not what happened.  *As a result of* the conspiracy and *pursuant to* the conspiracy, Eagle Eyes—and Homy Hsu specifically—used the prices of its competitors as a basis to calculate its own prices.  Such conduct is classic price fixing that is unlawful.  Such conduct, moreover, demonstrates that Eagle Eyes' prices were affected and influenced by the price-fixing conspiracy.

### B.  Homy Hsu Was a Manager or Supervisor in the Conspiracy

The Probation Office has determined that a three-point increase in the offense level is warranted for Homy Hsu's role as a manager or supervisor in the conspiracy.  The government agrees.  Under U.S.S.G. §3B1.1(b), the three-point adjustment is based on a determination that Homy Hsu was "a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive."  Commentary to section 3B1.1 states, "[t]o qualify for an adjustment under this section, the defendant must have been the . . . manager or supervisor of one or more other participants," where "participant" is defined as a "person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. §3B1.1 cmt. nn. 1-2; *see also United States v. Helmy*, 951 F.2d 988, 997 (9th Cir. 1991).

Although section 3B1.1(b) requires that the criminal activity involve at least five participants (or otherwise be extensive), "there is no requirement . . that the defendant exercise authority over at least five participants."  Instead, a defendant need only have managed or supervised at least one other participant involved in the commission of the crime.  *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993).  There is no dispute that the auto lights price-fixing conspiracy involved five or more participants.  Indeed, a total of five individuals have been charged in connection with the auto lights price-fixing conspiracy: (1) the defendant Homy Hsu, (2) Polo Hsu, (3) Andrew Chen, (4) Shiu-Min Hsu, and (5) Yu-Chu Lin.  *See United States v. Egge*, 223 F.3d 1128, 1134 (9th Cir. 2000) (the defendant himself may be included among the participants in the criminal activity for purposes of U.S.S.G. §3B1.1(b)).  In addition to these charged participants, the conspiracy involved many other co-conspirators who have not been charged.

//

16

1    A role adjustment under U.S.S.G. §3B1.1 is warranted if the defendant exercised "some

2    degree of control or organizational authority over others."  *United States v. Koenig*, 952 F.2d

3    267, 274 (9th Cir. 1991); *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990)

4    (implicit in the terms "organizer, leader, manager, and supervisor," each of which suggests the

5    presence of underlings or subordinates, is a requirement that the defendant must have exercised

6    some control over others or must have been responsible for organizing others for the purpose of

7    carrying out the crime) (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990)).

8    There is overwhelming evidence that Homy Hsu was a manager or supervisor of at least

9    one other participant in the price-fixing conspiracy.  Indeed, Homy Hsu supervised and managed

10   numerous participants.  Within Eagle Eyes, he exercised control and authority over Vincent

11   Chou, Elaine Lin, Mandy Kuo, and Ching-Tsung Lai.  All four were Eagle Eyes employees who

12   were aware of the price-fixing conspiracy and participated in its execution.  All four were

13   subordinate to Homy Hsu and acted to further the conspiracy at his direction.  *See*, *supra*, pp. 7-

14   10.  Outside of Eagle Eyes, Homy Hsu exercised control and authority over Andrew Chen by

15   dictating and monitoring the prices that Sabry Lee charged customers in the United States.

16   Homy Hsu played a critical role in assuring that the ultimate prices charged in the United States

17   by Andrew Chen at Sabry Lee were in accordance with the agreement.  *See*, *supra*, pp. 6-7.

18   Homy Hsu played a central, critical role in the conspiracy, acting as the key

19   representative from Eagle Eyes in conspiracy meetings and directing his subordinates at Eagle

20   Eyes to execute the agreement.  *See*, *supra*, pp. 4-10.  Homy Hsu had the most intimate

21   knowledge of the methods and formulas Eagle Eyes used to price its products.  *See*, *supra*, p. 6.

22   He exercised his authority to tell others at Eagle Eyes and Sabry Lee that pricing would be in

23   accordance with the agreement.  *See*, *supra*, pp. 6-7.  He instructed others to attend conspiracy

24   meetings and prompted them to speak at meetings.  *See*, *supra*, pp. 9-10.  He kept his

25   subordinates informed of conspiracy-related activities.  He forwarded conspiracy-related

26   documents, directing recipients to keep the documents secret.  *See*, *supra*, pp. 8-10.  He directed

27   subordinates to maintain communications with competitors to facilitate the flow of conspiracy-

28   //

17

related information.  *See*, *supra*, pp. 8-9.  Indeed, he represented Eagle Eyes in the conspiracy precisely because of his position and the managerial expertise he brought to the conspiracy.

That TYC and Depo were larger companies than Eagle Eyes and that other co-conspirators may have exercised greater initiative and authority over the price-fixing conspiracy are immaterial to whether a role adjustment is also appropriate for Homy Hsu.  In *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993), the defendant argued that a four-level increase for organizer/leader role was inappropriate as a matter of law because one of his co-defendants exercised greater authority.  The Ninth Circuit rejected this claim, stating that "the fact that [a co-defendant] occupied a leadership role in the enterprise does not preclude [the defendant] from also occupying an organizational or leadership role as well."  *Id.*  Indeed, as the *Barnes* court pointed out, Application Note 3 (which is currently Application Note 4) to U.S.S.G. §3B1.1 recognizes that there can be more than one person who qualifies as an organizer or leader.  *Id.* The existence of one organizer or leader does not preclude others from also being organizers or leaders, just as it does not preclude others from also being managers or supervisors.

## V.    RECOMMENDED SENTENCE

The United States recommends that the Court sentence Homy Hsu to serve 27 months in prison and pay a $25,000 fine.  No departure below the Guidelines prison sentence of 27 months is warranted, nor do the factors under 18 U.S.C. § 3553(a) support any departure or variance below the Guidelines.  Rather, the sentencing factors enumerated in 18 U.S.C. § 3553(a) support a 27-month prison sentence.  The Court need not address each sentencing factor explicitly, as long as the record as a whole indicates that the Court considered the factors.  *United States v. Eureka Laboratories, Inc.*, 103 F.3d 908, 913-14 (9th Cir. 1996).  We address the relevant sentencing factors below.

The Probation Office has recommended a fine of $25,000, consistent with the government's recommendation.  However, the Probation Office has also examined the defendant's finances and determined that Homy Hsu does not appear to have the ability to pay a fine at sentencing.  The government does not object to the Probation Office's factual findings

//

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

regarding the defendant's finances and does not contest the Office's conclusion regarding the

defendant's ability to pay.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Homy Hsu Support a Guidelines Sentence

The "nature and circumstances of the offense and the history and characteristics of the

defendant" support a 27-month prison term.  *See* 18 U.S.C. § 3553(a)(1).  Because violations of

the antitrust laws are serious offenses, Congress increased the maximum prison terms for

antitrust violators from three to ten years.  Antitrust Criminal Penalty Enhancement and Reform

Act of 2004, Pub. L. 108-237 (2004).  In response to the new statutory maximum, the Sentencing

Commission amended the antitrust guidelines, effective November 1, 2005, by raising the base

offense level for antitrust offenses from level 10 to level 12 (U.S.S.G. §2R1.1(a)) and by

increasing the volume of commerce table (U.S.S.G. §2R1.1(b)(2)).

The increased maximum sentences reflect that criminal antitrust violations are serious,

white-collar crimes like mail and wire fraud.  Congress intended to send a message to antitrust

offenders: "if they are caught they will spend much more time considering the consequences of

their actions within the confinement of their prison cells."  150 Cong. Rec. H3657 (daily ed. June

2, 2004) (statement of Rep. Sensenbrenner).  As Senator Kohl noted, "criminal antitrust

violations, crimes such as price fixing and bid rigging, committed by business executives in a

boardroom are serious offenses that steal from American consumers just as surely as does a

street criminal with a gun."  150 Cong. Rec. S3610-02, S3615.

In some ways, the white-collar price fixer is more blameworthy than the common

criminal.  White-collar criminals are often in less desperate circumstances when they commit

their crimes than a typical offender.  When sentencing two price fixers, Judge Bennett of the

Northern District of Iowa observed that a "crime of fraud by one who already has more than

enough—and who cannot argue that he suffered a deprived or abusive childhood or the

compulsion of an expensive addiction—is simply a crime of greed."  *United States v.

VandeBrake*, 771 F. Supp. 2d 961, 1006 (N.D. Iowa 2011) (internal citations and quotations

omitted), *aff'd*, 679 F.3d 1030 (8th Cir. 2012).  And yet, "[b]ecause the nature of their crimes,

19

1    white-collar offenders are uniquely positioned to elicit empathy from a sentencing court.  District

2    courts sentencing white collar criminals can more often identify with the criminal . . . But,

3    socioeconomic comfort with a criminal convict is not a sufficient reason to show leniency."

4    *United States v. Edwards*, 622 F.3d 1215, 1216-17 (9th Cir. 2010) (dissent of Judges Gould,

5    Bybee, Callahan, and Bea).

6         The nature and circumstances of this offense are serious.  Homy Hsu participated for

7    seven years in a price-fixing conspiracy that had a primary focus—the United States market—

8    and a primary group of victims—American consumers.  Hsu was the second-in-command at

9    Eagle Eyes.  While it was Chairman Lin who initially bound Eagle Eyes to the price-fixing

10   agreement, it was ultimately Homy Hsu who was instrumental in ensuring its implementation.

11   And it was ultimately Homy Hsu who attended meeting after meeting for seven years, acting as

12   Eagle Eyes' representative, spokesperson, and decision-maker; who affirmed, over and over

13   again, Eagle Eyes' commitment to the conspiracy; who enlisted subordinate employees in the

14   price-fixing scheme and instructed them to keep it secret; and who developed detailed pricing

15   formulas in accordance with the agreement.  *See*, *supra*, p. 4-10.

16        Letters attesting to Homy Hsu's integrity, character, loyalty, and dedication have been

17   submitted to the Court.  But Hsu should be sentenced for what he did, not who he is.  Homy Hsu

18   is a high-level executive with significant managerial responsibility and a wealth of experience in

19   the auto lights industry.  Such a position is ordinarily a prerequisite to fix prices.  Indeed, his

20   management experience and dedication to the company were assets to the conspiracy, giving

21   Eagle Eyes credibility among the other co-conspirators and allowing the conspiracy to persist for

22   seven years.  And like the vast majority of price fixers, Homy Hsu has no prior criminal record.

23        These characteristics and histories, however laudable, are shared by most price-fixing

24   defendants.  They provide no reason to depart downward from the Guidelines sentence because

25   the antitrust guidelines account for such a typical offender.  *See United States v. Carter*, 560 F.3d

26   1107, 1121-22 (9th Cir. 2009) (observing that a defendant's prior history and circumstances must

27   be so "atypical as to put [the defendant] outside the 'minerun of roughly similar' cases

28   considered by the Sentencing Commission in formulating the Guidelines"); *see also* U.S.S.G.

§5H1.11 ("Civic, charitable, or public service; employment related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.").

### B.   The Recommended Sentence Promotes Respect for the Law, Provides Just Punishment for the Offense, and Affords Adequate Deterrence

A 27-month sentence representing the bottom of the Guidelines range is necessary "to "promote respect for the law," "to provide just punishment for the offense," and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). Deterrence "is particularly important in the area of white collar crime." S. Rep. No. 98-225, at 76 (1983) *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)). And because defendants in white-collar crimes "often calculate the financial gain and risk of loss," such crimes "therefore can be affected with serious punishment." *Id*. Moreover, there is no risk of over-deterrence because antitrust cartels serve no legitimate purpose and are never efficient or otherwise socially desirable. As Judge Richard Posner explained, criminal sanctions "are not really prices designed to ration the activity; the purpose so far as possible is to extirpate it." Richard A. Posner, *An Economic Theory of Criminal Law*, 85 Colum. L. Rev. 1193, 1215 (1985).

Significant prison sentences for individuals are an effective deterrent, even more so than significant fines. The legislative history of the Sentencing Reform Act notes that for white-collar crimes, "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 98-225, at 91-92 (1983) *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75. As a "very senior corporate executive" once told a top antitrust enforcer, "as long as you are only talking about money, the company can at the end of the day take care of me . . . but once you begin talking about taking away my liberty, there is nothing that the company can do for me." Donald I. Baker, *The Use of Criminal Law Remedies to Deter and Punish Cartels and Bid Rigging*, 69 Geo. Wash. L. Rev.

21

693, 705 (2001).  Employees have been known to expose themselves and their employers to enormous risk in the pursuit of profit for the employer.  The risk of incarceration will help deter such behavior.

It is no answer, and certainly no excuse, that this cartel began overseas in Taiwan and was conducted in part in Taiwan by Taiwanese business executives.  Homy Hsu and his co-conspirators knew that their behavior was illegal and violated antitrust laws.  *See*, *supra*, p. 10.  They took steps to conceal their behavior, instructing subordinates to keep the conspiracy confidential and inventing an elaborate cover story to explain to their customers their coordinated price adjustments.  *See*, *supra*, p. 10.  Homy Hsu and his co-conspirators also knew that their conduct ran counter to common sense and accepted business practices based on competition and free markets.  *See*, *supra*, p. 10.  But, nevertheless, their conduct persisted for many years.  A Guidelines sentence of 27 months will promote respect for the law, provide just punishment, and afford adequate deterrence.

## C.      The Recommended Sentence Does Not Result in Unwarranted Sentencing Disparities

The government's recommended sentence of 27 months imprisonment does not create "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  To the contrary, any disparity here is fully justified by the differences between Homy Hsu and the other individual co-conspirators who have or will be sentenced.  While this sentencing factor seeks to promote national uniformity in sentencing by treating similarly situated defendants similarly, it does not require uniformity of sentencing among co-defendants within the same case.  *United States v. Green*, 592 F.3d 1057, 1072 (9th Cir. 2010); *United States v. Sauteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007).  Nor is it designed to eliminate all sentence disparities, only *unwarranted* sentence disparities.  And even unwarranted disparities will "not render [defendants'] sentences unreasonable."  *United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006) (stating that "the need to avoid unwarranted disparities is only one factor a district court is to consider in imposing a sentence.").

22

As an initial matter, the Guidelines, by linking sentences to the volume of affected commerce, capture the scope and duration of the crime and thus provide a built-in mechanism to ensure basic parity.  Thus, a sentence within the Guidelines range satisfies section 3553(a)(6).  As the Ninth Circuit stated in a case in which a defendant challenged his Guidelines sentence, "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.  Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."  *United States v. Treadwill*, 593 F.3d 990, 1011 (9th Cir. 2010) (internal quotations omitted); *see also United States v. Becerril-Lopez*, 541 F.3d 881, 895 (9th Cir. 2008) ("[W]e have trouble imagining why a sentence within the Guidelines range would create a disparity.").

While other individual co-conspirators in the auto lights conspiracy received or are expected to receive lower sentences than that recommended for Homy Hsu, those other sentences are inappropriate benchmarks because those other defendants are not similarly situated.  *See United States v. Fernandez*, 443 F.3d 19, 32 (9th Cir. 2009) (holding that a disparity between non-similarly situated defendants is not a valid basis for a claim of error under 18 U.S.C. § 3553(a)(6)).  Unlike Homy Hsu, all other individual defendants in this case cooperated with and substantially assisted the government's investigation and prosecution of this price-fixing conspiracy.  *See*, *supra*, n. 2.  They received or are expected to receive significant downward departures from their Guidelines sentences for their cooperation.  All of them pled guilty when there were outstanding targets to be prosecuted, at a time when their cooperation was still valuable to the government.  All of them sat for multiple interviews, gave facts, provided leads, explained documents, and implicated co-conspirators.  All of them were expected to testify at the trial against Homy Hsu and logged numerous hours preparing for their trial testimony.

Homy Hsu has never provided any assistance and has not pledged any going forward.  Homy Hsu is only in the United States to face the charges against him because he was arrested at Los Angeles International Airport while he was passing in transit through the United States.  Homy Hsu had no intention of otherwise coming to the United States to face the charges and

23

accept responsibility for his conduct. *See*, *supra*, p. 2. Instead, when he was arrested at LAX, he insisted that "he was not guilty" and "repeatedly stated he could not be arrested because he was only transiting the United States and never entered the country." Lem Decl., Ex. A. Indeed, Homy Hsu showed little remorse or acceptance of responsibility until the brink of trial, after his attorneys had filed several unsuccessful pre-trial motions.

Cooperation from cartel insiders is extraordinarily valuable in the investigation and prosecution of price-fixing conspiracies, which, by their nature, are secretive and operate in the shadows, as this auto lights cartel did. The government relies heavily on this kind of cooperation to break up cartels, and it is worthy of the significant downward departures which this Court has already given for Polo Hsu and will consider giving for Andrew Chen and Shiu-Min Hsu who will be sentenced in February. It would be inappropriate to use the sentences of the cooperating defendants as a benchmark for Homy Hsu. Such benchmarking would be highly inequitable to the cooperating defendants because it would allow Homy Hsu to derive a benefit from the timely guilty pleas and valuable cooperation of the cooperating defendants. "In most cases, it will be inappropriate for a sentencing court to give a non-cooperating defendant the benefit of his co-defendant's cooperation." *United States v. Caperna*, 251 F.3d 827, 831-32 (9th Cir. 2001).

### D.      Restitution Is Not Necessary

The Court should consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). In this case, the United States does not recommend that restitution be imposed on Homy Hsu. Victims of antitrust offenses may recover treble damages in civil suits for violations of the Sherman Act under provisions of the Clayton Act, 15 U.S.C. §§ 15, *et seq*. And as the Court is aware, victims have filed civil suits seeking treble damages against Eagle Eyes, E-Lite, and its co-conspirators. Those class actions are pending in the Central District of California before Judge George Wu. *In re Aftermarket Automotive Lighting Products Antitrust Litigation*, No. 09-ML-2007 GW. Because civil damages are available to victims and because imposing restitution is neither required nor practicable in this case, the government does not recommend restitution.

//

US' SENTENCING MEMORANDUM RE HOMY HONG-MING HSU
CR 11-0488 RS

## VI.    CONCLUSION

The United States respectfully requests that the Court sentence Homy Hsu to 27 months imprisonment, a $25,000 fine, no restitution, and no supervised release.

DATED: January 15, 2013                    Respectfully submitted,

                                            /s/   Jacklin Chou Lem
                                           JACKLIN CHOU LEM
                                           MAY LEE HEYE
                                           HOWARD J. PARKER
                                           KELSEY C. LINNETT
                                           ANNA TRYON PLETCHER
                                           Attorneys for the United States

25